IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| NEWSTAR SOURCING AND SERVICE, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID PATEE, DANIEL PATEE, and CONSUMERS SUPPLY DISTRIBUTING, LLC,<br><br>Defendants. | 8:19CV226<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the Motion to Dismiss filed by Defendants David Patee (David) and Daniel Patee (Daniel), ECF No. 14, and the Motion to Dismiss filed by Defendant Consumer Supply Distributing, LLC (CSD), ECF No. 15. For the reasons stated below, the Motions will be granted.

## BACKGROUND

The following facts are a summary of those alleged in the Complaint, ECF No. 1, and are assumed true for purposes of the Motions to Dismiss.

Plaintiff NewStar Sourcing and Service, LLC (NewStar) is a Nebraska limited liability company located in Omaha, Nebraska. Defendant CSD is a Minnesota limited liability company located in North Sioux City, South Dakota. David is the President of CSD and Daniel is its Vice President.

NewStar and CSD sell agricultural feed additives, feed ingredients, and other related supplies and products. In the agricultural feed additive and ingredient supply chain, producers sell additives and ingredients to one or more suppliers (Agricultural Feed Product Suppliers) who market and sell to other suppliers or to end users. NewStar and

1

CSD are both Agricultural Feed Product Suppliers in the states of Nebraska, South Dakota, Minnesota, Iowa, Missouri, and Wisconsin (the "Midwestern Feed Product Market"). There are two primary Agricultural Feed Product Suppliers in the Midwestern Feed Product Market—CSD and Nutra-Blend, LLC (Nutra-Blend), and a limited number of smaller Agricultural Feed Product Suppliers, including NewStar. CSD has been an Agricultural Feed Product Supplier since 1956. NewStar entered the Midwestern Feed Product Market in 2017.

NewStar alleges that CSD instructed a number of agricultural feed product vendors to refuse to do business with NewStar, and to refuse to supply agricultural feed additives, ingredients, and related supplies and products to NewStar. Specifically, in late 2017, Daniel allegedly contacted RALCO Animal Nutrition's senior managers and instructed them not to do business with NewStar. A CSD representative also allegedly contacted a Midwest Ag Supplement, LLC, representative and a Lallemond Animal Nutrition representative and instructed them not to do business with NewStar. NewStar alleges that CSD's conduct has caused NewStar to lose business relationships and opportunities.

NewStar also alleges Defendants are engaging in predatory pricing by selling various agricultural feed products in the Midwestern Feed Product Market at below fair market values and below cost. Specifically, David allegedly contacted AGresearch, Inc., and advised its managers that CSD intended to sell AGresearch, Inc.'s products with minimal profit margins, or below CSD's costs if necessary, to drive NewStar out of business. CSD proceeded to sell AGreasearch, Inc.'s product Maxi Bond for $48.31 per bag in the Midwestern Feed Market. CSD's cost is approximately $48.50 per bag. Before NewStar entered the Midwestern Feed Product Market, CSD was selling Maxi Bond in

the Midwestern Feed Product Market for $51.60 per bag. NewStar alleges that if CSD is successful in driving NewStar out of business, CSD will be the only large Agricultural Feed Product Supplier in the Midwestern Feed Product Market selling to non-cooperative customers and will be able to raise the price of the products it is currently selling below market value or below cost to recoup the losses it has sustained as a result of its current pricing.

NewStar further alleges Defendants are engaging in price discrimination by selling agricultural feed products at prices that are at or above the fair market values and above CSD's cost outside the Midwestern Feed Product Market while selling the same products at below fair market value or cost in the Midwestern Feed Product Market. Specifically, CSD sells Aviala-4 for $1.74 more per bag outside the Midwestern Feed Product Market[1] and sells AvialaZn 120 for $3.94 more per bag outside the Midwestern Feed Product Market.

On May 21, 2019, NewStar filed a Complaint alleging violations of the Sherman Antitrust Act, 15 U.S.C. § 2; the Robinson-Patman Act, 15 U.S.C. § 13(a); and Nebraska's Junkin Act, Neb. Rev. Stat. §§ 59-805 and 59-816. Defendants seek dismissal of NewStar's Sherman Antitrust Act and Robinson-Patman Act claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

**STANDARD OF REVIEW**

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy this requirement, a

---

[1] NewStar's Complaint references Aviala-4 twice on the list of products allegedly sold at discriminatory rates and lists different prices. Regardless, the Court recognizes that NewStar alleges the product is sold at a higher rate outside of the Midwestern Feed Product Market.

3

plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Corrado v. Life Inv'rs Ins. Co. of Am.*, 804 F.3d 915, 917 (8th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Barton v. Taber*, 820 F.3d 958, 964 (8th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (citing *Iqbal*, 556 U.S. at 678), *cert. denied*, 135 S. Ct. 2941 (2015). The Court must accept factual allegations as true, but it is not required to accept any "legal conclusion couched as a factual allegation." *Brown v. Green Tree Servicing LLC*, 820 F.3d 371, 373 (8th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678).

On a motion to dismiss, courts must rule "on the assumption that all the allegations in the complaint are true," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 555, 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Mickelson v. Cty. of Ramsey*, 823 F.3d 918, 923 (8th Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679).

## DISCUSSION

**I.      Sherman Antitrust Act 15 U.S.C. § 2**

Section 2 of the Sherman Antitrust Act, "makes it unlawful to 'monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States.'" *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517 (8th Cir. 2018) (quoting 15 U.S.C. § 2). NewStar's claim is based on an alleged attempt to monopolize.[2] "To establish an attempted monopolization claim under the Sherman Act, a plaintiff must prove: '(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success.'" *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549 (8th Cir. 2007) (quoting *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 810 (8th Cir.1987)); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

"In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum*, 506 U.S. at 456 (citations omitted). "In proving whether the defendant possesses sufficient power to come dangerously close to achieving monopoly power, the plaintiffs must have demonstrated the relevant geographic and product markets within which that dangerous probability occurred." *Gen. Indus.,* 810 F.2d at 804 (citing *United States v. Empire Gas*, 537 F.2d 296, 302 (8th Cir. 1976). A plaintiff must also demonstrate "that substantial barriers to entry protect that market." *United States v. Microsoft Corp.*, 253 F.3d 34, 81 (D.C. Cir.

---

[2] CSD argues for dismissal of NewStar's Sherman Act claim for actual monopolization. Def. Br., ECF No. 16, Page ID 45. NewStar argues against dismissal of its Sherman Act claim only on a theory of attempted monopolization. It does not appear NewStar attempted to assert a claim of actual monopolization in its Complaint, ECF No. 1, and the Court will construe NewStar's Sherman Act claim as a claim only for attempted monopolization.

2001). "[T]he dangerous probability standard is a complex and fact-intensive inquiry, courts 'typically should not resolve this question at the pleading stage unless it is clear on the face of the complaint that the dangerous probability standard cannot be met as a matter of law.'" *Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 341–42 (3d Cir.), *cert. denied*, 139 S. Ct. 211 (2018) (citation and internal quotations omitted); *see also Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) ("[C]ourts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery, because the proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators.").

NewStar alleges CSD sold products, specifically Maxi-Bond, at below cost with the intent to control prices, destroy competition, and exercise monopoly power in the Midwestern Feed Product Market. CSD argues that NewStar's Complaint fails to allege a dangerous probability of success with respect to CSD's alleged attempts at monopolization. Specifically, CSD argues that NewStar failed to plead a plausible relevant market or barriers to market entry.

A. <u>Plausible Relevant Market</u>

"It is the plaintiff's burden to define the relevant market." *Park Irmat Drug,* 911 F.3d at 517 (quoting *Double D Spotting*, 136 F.3d at 554). "Most often, 'proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.'" *Double D Spotting*, 136 F.3d at 560 (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997), *cert. denied*, 523 U.S. 1059 (1998)). "This general rule, however, does not amount to 'a *per se* prohibition against dismissal of antitrust claims for failure to plead a relevant market under Fed.R.Civ.P.

12(b)(6).'" *Id.* (quoting *Queen City Pizza*, 124 F.3d at 436). "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001). "[C]ourts have not hesitated to dismiss antitrust claims where it is clear that the alleged geographic market is too narrow or implausible." *Little Rock Cardiology Clinic, P.A. v. Baptist Health*, 573 F. Supp. 2d 1125, 1148 (E.D. Ark. 2008), *aff'd*, 591 F.3d 591 (8th Cir. 2009) (citing *Ferguson Med. Group, L.P. v. Missouri Delta Med. Ctr.*, No. 1:06CV8, 2006 WL 2225454, at *3 (E.D.Mo. Aug. 2, 2006)).

"The definition of the relevant market has two components—a product market and a geographic market." *Park Irmat Drug,* 911 F.3d at 517 (quoting *Bathke v. Casey's Gen. Stores, Inc.,* 64 F.3d 340, 345 (8th Cir. 1995)). CDS alleges NewStar failed to plead a plausible relevant product market or relevant geographic market.

### 1. Relevant Product Market

"The outer boundaries of a product market can be identified by the reasonable interchangeability, or cross-elasticity of demand, between the product and possible substitutes for it*." F.T.C. v. Lundbeck, Inc.*, 650 F.3d 1236, 1240 (8th Cir. 2011) (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962)). "Determining a product market requires identifying the choices available to consumers, focusing on 'whether consumers will shift from one product to the other in response to changes in their relative cost.'" *Id.* (quoting *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 (8th Cir.1981)). However, "[t]he Supreme Court has made clear that '[w]e see no barrier to combining in

a single market a number of different products or services where that combination reflects commercial realities.'" *Fed. Trade Comm'n v. Staples, Inc.*, 190 F. Supp. 3d 100, 117 (D.D.C. 2016) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)).

"Defining a relevant product market is primarily 'a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.'" *Gen. Indus*, 810 F.2d at 805 (quoting *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.), *cert. denied*, 439 U.S. 838 (1978)). There is no requirement that every product in the product market be interchangeable with every other product in the product market. *See United States v. E. I. Du Pont de Nemours & Co.*, 353 U.S. 586, 595 (1957) (upholding relevant market consisting of automotive finishes and fabrics under the Clayton Act); *Gen. Indus.*, 810 F.2d at 805–06 (affirming relevant market of "pet supplies," consisting of non-interchangeable goods, as "pragmatic and realistic description of the level at which [antitrust defendant's products and plaintiff's products] were in competition"); *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1016 (9th Cir. 1983) ("So long as the distributional market is set at the wholesale level, the fact that face creams and shampoos do not have the same use for the consumer is not as relevant as whether a 'cluster' or 'product line' of one manufacturer is reasonably interchangeable for that of another by the salon that is making the purchase.").

NewStar defined the relevant product market as the "wholesale market for agricultural feed additives and ingredients."[3] Compl., ECF No. 1, Page ID 3. NewStar

---

[3] In its brief, NewStar attempts to further narrow its product market to the "submarket consisting of customers who are not members of farming cooperatives." Pl. Br., ECF No. 23, Page ID 80. "Where the plaintiff . . . alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is

8

further defined "agricultural feed additives and ingredient" as "commodities that include plant products and byproducts, animal products and byproducts, chemically-synthesized vitamin, mineral, and other supplements, and other manufactured nutrients that are intended for livestock consumption." *Id.* NewStar alleges CSD and NewStar are Agricultural Feed Product Suppliers meaning they purchase agricultural feed additives and ingredients from initial producers and then market and sell the additives and ingredients to other Agricultural Feed Product Suppliers or end users. Compl., ECF No. 1, Page ID 3-4. NewStar and CSD both use, or attempt to use, the same vendors to purchase their agricultural feed additives and ingredients. *Id.* at 5. Based on the allegations in NewStar's Complaint, agricultural feed additives and ingredients have a similar use--livestock consumption. It is also plausible that NewStar and CSD's customers purchase agricultural feed additives and ingredients together. Thus, the Complaint sufficiently alleges a relevant product market.

### 2. Relevant Geographic Market

"Properly defined, a geographic market is a geographic area 'in which the seller operates, and to which . . . purchaser[s] can practicably turn for supplies.'" *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 598 (8th Cir. 2009) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). In other words, the relevant geographic area "consists of the 'area in which consumers can practically seek alternative sources of the product.'" *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388

---

legally insufficient and a motion to dismiss may be granted." *Queen City Pizza, Inc.*, 124 F.3d at 436 (citations omitted). NewStar did not plead the alleged submarket was the relevant product market in its Complaint and the Complaint makes no factual allegations to support a meaningful distinction between the market for sales to cooperative organizations and their members and sales to non-cooperative customers. Thus, the Court will consider only the broader product market contained in NewStar's Complaint for purposes of this Motion to Dismiss.

9

(8th Cir. 2007) (quoting *Double D Spotting*, 136 F.3d at 560). "The mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991).

NewStar defines the relevant geographic market as "the Midwest regions of the United States, to include the states of Nebraska, South Dakota, Minnesota, Iowa, Missouri, and Wisconsin." Compl., ECF No. 1, Page ID 3-4. NewStar also alleges NewStar and CSD both marketed and sold agricultural feed additives and ingredients within the defined geographic market. *See id.* NewStar's Complaint contains no other facts indicating why it limited the relevant geographic market to these six states.[4] NewStar has not alleged any facts demonstrating why CSD's consumers would be precluded from purchasing products from outside the six-state area if CSD were to raise its prices. Thus, NewStar has failed to adequately plead why the relevant geographic market should be limited to the six states specified in its Complaint, and its Sherman Act claim will be dismissed. *See Prescient Med. Holdings, LLC v. Lab. Corporaton of Am. Holdings*, CV 18-600, 2019 WL 635405, at *5 (D. Del. Feb. 14, 2019) ("[B]ecause the allegations in the Complaint consider only where the parties offer services and not where customers can rationally look for services, the Complaint fails to define a relevant geographic market.").

---

[4] In its brief Newstar states that it "has alleged a geographic market encompassing six states—the states in which NewStar is currently operating and which form the bounds of the area in which NewStar and CSD are actually competing. Pl. Br., ECF NO. 23, Page ID 87. However, for purposes of the Motion to Dismiss, the Court will consider only those facts contained in NewStar's Complaint. The Complaint does not specifically state that CSG or NewStar operated *only* in these six states. Even if the Court were to consider the allegations contained in NewStar's brief, they would be insufficient to prevent dismissal. *See Dicar, Inc. v. Stafford Corrugated Prod., Inc.*, No. 2:05CV5426, 2010 WL 988548, at *11 (D.N.J. Mar. 12, 2010) ("This market definition focuses impermissibly on the specific geographic market in which Plaintiffs (i.e., manufactures) conduct their business—as opposed to the geographic market that consumers would be willing to access to purchase die cutter blankets.").

B. Barriers to Market Entry

Even if the Court inferred a properly defined market, NewStar's Complaint would still be dismissed for failure to allege barriers to market entry. A firm cannot threaten to achieve monopoly in a market unless that market is, or will be, protected by significant barrier to entry. *Microsoft Corp.*, 253 F.3d at 82 (citing *Spectrum Sports,* 506 U.S. at 456). Plaintiffs must not only show that barriers to entry protect the properly defined market, but that those barriers are significant. *Id.* "Any market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant firm should be considered a barrier to entry . . . ." *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.*, 740 F.2d 980, 1001 (D.C. Cir. 1984). "[M]ain sources of entry barriers are: (1) legal license; (2) control over an essential or superior resource; (3) entrenched buyer preferences for established brands or company reputations; and (4) capital market evaluations imposing higher capital costs on new entrants." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1428 n. 4 (9th Cir. 1993) (citing *2 Areeda & Turner, Antitrust Law* ¶ 409b at 299–300 (1978)). "Economies of scale may also be considered an entry barrier in some situations." *Id.* Plaintiffs have the burden of establishing barriers to entry into a properly defined relevant market. *Microsoft Corp.*, 253 F.3d at 82.

NewStar agrees that it is required to allege barriers to entry into the market, but it argues that it has adequately alleged such barriers—specifically, CSD's six decades of established market presence and its attempts to use its status and relationships with vendors to strangle market supply and to blacklist competitors, including NewStar, from obtaining specialized additives and ingredients required to compete. In its Complaint,

NewStar refers to CSD's alleged conduct as an "[a]ttempt" to disrupt NewStar's vendor relationships; mentions three vendors allegedly contacted by CSD; and concludes that "NewStar has lost business relationships and opportunities." Compl., ECF No. 1, Page ID 5. Yet NewStar does not allege how many, if any, of the three vendors refused to do business with NewStar and does not allege that there were no other vendors available to provide NewStar with agricultural feed additives or ingredients. Thus, NewStar has not adequately pled facts that would support its argument that CSD had control over an essential or superior resource.

Although NewStar pled that CSD had been in the agricultural feed additive and ingredient business since 1956, NewStar made no other factual allegations supporting its argument that there was an entrenched buyer preference for established brands or company reputations. NewStar also failed to allege how CSD's longevity, name recognition, or "entrenched status" otherwise prevented entry into the market by new competitors. Thus, NewStar has failed to plead factual allegations to support its argument that there were significant barriers to entry into the market.[5]

## II. Robinson-Patman Act 15 U.S.C. § 13(a)

The Robinson-Patman Act makes it unlawful for

> any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

---

[5] It is not necessary for the Court to reach CSD's argument that the additional market suppliers preclude a finding of a dangerous probability of success.

12

15 U.S.C. § 13(a). The Robinson–Patman Act only condemns price discrimination that presents a "reasonable possibility" of substantial injury to competition. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222 (1993) (quoting *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 434 (1983)).

The Robinson Patman Act prohibits primary-line violations. *Godfrey v. Pulitzer*, 276 F.3d 405, 408 n. 7 (8th Cir. 2002) (citation omitted). Primary-line violations occur when "the discriminating seller's price discrimination adversely impacts competition with the seller's competitors." *Id.; see also Rebel Oil Co. v. Atl. Richfield Co.*, 146 F.3d 1088, 1092 (9th Cir. 1998) ("The [Robinson-Patman Act] prohibits 'primary-line' price discrimination, when the seller charges predatory, below-cost prices in one geographical market to eliminate competitors there, but charges supracompetitive prices in another market."). In a primary-line price discrimination claim under the Robinson-Patman Act, "a plaintiff seeking to establish a competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs" and "that the competitor had a reasonable prospect . . . of recouping its investment in below-cost prices." *Brooke Grp.*, 509 U.S. at 222–24.

NewStar's Robinson-Patman Act claim is based on allegations that CSD is selling products outside the Midwestern Feed Product Market for prices above the fair market value or above cost and selling the same or similar products below fair market value or cost in the Midwestern Feed Product Market. Defendants argue NewStar's claim should be dismissed for failing to plead that CSD sold Availa-4 or AvailaZN 120 for a price below CSD's cost. In response, NewStar argues that its allegations under the Robinson-Patman Act are not limited to Availa-4 and AvailaZn 120; that it did plead facts supporting its claim

that Maxi Bond was sold below cost; and that Availa-4 and AvailaZn 120 were included in the general definition of below-cost products. CSD also alleges that NewStar failed to allege a plausible claim that CSD has a reasonable prospect of recoupment.[6]

NewStar alleged that "CSD is selling various agricultural feed products in the Midwestern Feed Product Market below those products' fair market values and below the applicable measure of CSD's costs (collectively, the 'Below-Cost Products')." Compl., ECF No. 1, ¶ 24. NewStar further alleged that CSD sold Maxi Bond, which costs CSD approximately $48.50 per bag, for $48.31 per bag in the Midwestern Feed Product Market and that before NewStar entered the market CSD was selling Maxi Bond for $51.60. *Id*. at ¶ 27. These allegations are contained in the section of NewStar's Complaint labeled "Defendant's Predatory Pricing" but are incorporated by reference into the section labeled as NewStar's Robinson-Patman Act claim.

> NewStar's Complaint states that
>
> CSD has sold . . . agricultural feed products that are of like grade and quality when compared to the Below-Cost Products in markets outside of the Midwestern Feed Product Market for prices at or above those product's fair market values, the applicable appropriate measure of CSD's costs, and the prices charged for the Below-Cost Products. These agricultural feed products include, but are not necessarily limited to: a. Availa-4, which is sold in the Midwestern Feed Market for $103.22 per bag and outside the Midwestern Feed Product Market for $104.96 per bag. b. AvailaZn 120, which is sold in the Midwestern Feed Product Market for $97.47 per bag and outside the Midwestern Feed Product Market for $101.41 per bag.

*Id*. at ¶ 32. NewStar's Complaint contains no factual allegation Maxi Bond was sold at a higher price outside the Midwestern Feed Market. Similarly, NewStar's Complaint

---

[6] NewStar's failure to allege a plausible relevant market, as discussed with respect to NewStar's Sherman Antritrust Act claim, also warrants dismissal of NewStar's Robinson-Patman claim. *Bathke*, 64 F.3d at 347 (affirming dismissal of plaintiff's Robinson-Patman claim at summary judgment for failing to create a jury question on the issue of the relevant geographic market).

14

contains no factual allegations regarding CSD's cost for Availa-4 or AvailaZn 120 and does not refer to either of these products by name in its initial definition of Below-Cost Products. NewStar's threadbare recitals of the elements of its price-discrimination claim, supported by conclusory statements, are not sufficient to state a plausible claim under the Robinson-Patman Act, and that claim will be dismissed.[7]

### III. Request for Leave to Amend

"The court should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). Yet leave may be denied where the proposed amendment is futile. *Hammer v. City of Osage Beach*, 318 F.3d 832, 844 (8th Cir. 2003) (citation omitted). In the section of NewStar's brief labeled "NewStar has made specific allegations that CSD is selling products below cost," it states that "if the Court believes that NewStar's allegations need clarification, additional factual content, or the like, leave should be given to allow NewStar to make those adjustments in an amended pleading." Pl. Br., ECF No. 23, Page ID 93. From the placement of the request to amend, the Court can infer that the amendment would relate to NewStar's failure to allege that CSD sold Availa-4 and AvailaZn 120 products below cost. However, because of the deficiency in NewStar's pleading regarding the relevant geographic market, without specific information on what amendments NewStar proposes, the Court cannot determine whether an amendment would be futile. Thus, should NewStar desire to amend its Complaint, it should file a motion to amend and attach an unsigned copy of the proposed amended complaint that clearly identifies the proposed amendments in accordance with NECivR 15.1.

Accordingly,

---

[7] It is not necessary for the Court to address CSD's alternate argument that NewStar failed to allege facts demonstrating a reasonable prospect of recoupment.

IT IS ORDERED:

1. The Motion to Dismiss, ECF No. 14, and the Motion to Dismiss, ECF No. 15, are granted; and

2. NewStar's claims under the Sherman Antitrust Act (Count III) and the Robinson-Patman Act (Count (IV) are dismissed without prejudice.

3. Defendants shall respond to the remaining claims in the Complaint, ECF No. 1, on or before November 6, 2019.

Dated this 22nd day of October, 2019.

BY THE COURT:

s/Laurie Smith Camp
Senior United States District Judge